UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Barbara Allen, | ) | Civil Action No. 4:03-1859-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT |
| -vs- | ) | AND RECOMMENDATION |
| | ) | |
| McNair Law Firm, P.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought by plaintiff pursuant to the Age Discrimination in Employment Act. The parties have participated in the discovery process and the matter is now before the court on defendant's motion for summary judgment (Document # 21) filed December 15, 2004.

### Standard for Summary Judgment

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come

-1-

forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

**Facts**

The relevant facts generally are not in dispute. Plaintiff, Barbara Allen, was born on October 8, 1939, and has occupied positions as a legal secretary for much of her adult life. In 2001, the attorney for whom she was working decided to retire and she began applying for other legal secretary positions in the Myrtle Beach area. She observed an advertisement in the local paper for a legal secretary position with defendant in its Myrtle Beach office and submitted a resume.

Henrietta Golding (Golding) was the managing partner of defendant in the Myrtle Beach office. The available legal secretary position was a position working with Ms. Golding. As managing partner, Golding was responsible for decisions regarding hiring and firing. Plaintiff was originally interviewed by Risa Hudson in the Human Resources Department of defendant. Golding interviewed plaintiff on May 1, 2001. Neither plaintiff or Golding recall much of the discussion that occurred during the interview, but nothing was discussed about plaintiff's age. In fact, Golding testified that she was not aware of plaintiff's age until after this lawsuit was filed, and that age was not a consideration in the hiring process. Plaintiff was the only applicant that Golding interviewed

and based on her experience as a legal secretary, Golding extended an offer of employment to plaintiff.  Plaintiff accepted the job offer and began work in June 2001.  She attended the standard training course in Columbia for legal secretaries beginning work with defendant.  At the training course, she was introduced to the computer system utilized by defendant, the handbook policies and procedures, including the firm's non-discrimination policy, and other general introduction topics.  She was also informed about and understood defendant's introduction or evaluation period which provides as follows:

> Introductory Period
>
> The first six months of employment will be designated as an introductory or evaluation period.  (NOTE: An employee must accept employment with clear understanding of this status.)  Upon satisfactory completion of this six-month evaluation period, the employee will become a regular employee and will be eligible to receive the following types of paid leave: (1) annual (vacation and personal) and (2) sick.  An employee who terminates during the six-month introductory period has not been granted any leave time and therefore will not be paid for any leave.  Performance will be carefully observed during the evaluation period, and progress will be discussed.  The supervisor will provide a performance review on the employee at the completion of the six-month period.  The review will be discussed with the employee and will inform the employee of his/her continued employment status.  The Firm, may, at its discretion, extend the six month evaluation if it deems necessary . . . .

After this training, plaintiff met with Golding, who told her that she expected plaintiff to act professionally, be part of a good work environment, and to do good work.

Plaintiff worked primarily for Golding but also did work for other attorneys who worked under Golding, as well as other attorneys in the office on occasion. Plaintiff's work assignments, excluding interpersonal skills met defendant's expectations.  However, Golding received complaints from plaintiff's co-employees, attorneys within the office, and legal secretaries and at least one

attorney from outside the law firm.  Regarding plaintiff's job performance, Golding testified in

relevant part as follows:

> Q: And did Ms. Allen's performance meet your expectations?
> A: No.
> Q: I'm going to ask you two things: the first one is going to be, were there any areas in which she did excel?
> A: No.
> Q: And can you tell me any specifics where you felt that her performance was lower than your expectations:
> A: Primarily in her confrontational attitude towards others in the workplace, and myself included.
> Q: And can you give me any examples?
> A: I can't tell you how many times I had other employees in this office approach me as to her bossiness, or nosiness.  I had a lawyer call me up on one occasion in which she chastised his secretary for the way his secretary answered the phone.  I had a client contact me and ask me why I would let someone with that attitude or that harshness on the phone to be an employee. It was constant and I talked to Barbara on many, many occasions about her inability to communicate, mostly with co-employees, but a lot of times with members on the outside.
> Q. Did you ever make any written record of your consultations with her?
> A. During the appraisal processes is the only time.
> . . .
> Q. Who - - do you remember who the lawyer was who had complained?
> A. Yeah, Greg McCollum.
> . . .
> Q. Okay.  Well, is the fact that the client complained one of the basis for the decision to terminate Ms. Allen?
> A. No, the client- -the basis- -I had- -it was like the straw that broke the camel's back.
> Q. The client calling you?
> A. No, Ms. Allen just taking it upon herself that she can dictate her own work schedule and not show up one day, and that was a multi- -that was just the final straw.
> . . .
> Q. Is the client call- - you mentioned the client calling and complaining as one of the reasons you felt Ms. Allen's performance was sub-par, is that correct?
> A. No, that is just an indication.  I had known her performance was sub-par before that time.  I attempted to counsel her on many occasions, she knew of it, and she knows that her skills, her people skills were extremely lacking in

this office.

. . .

Q. What was the client's complaint?

A. She was abrasive or something of that nature in talking to her.

. . .

Q. Okay. Do you remember any of the employees who complained to you?

A. Yes.

Q. And were they all complaining about people skills or did any have a substantive complaint about an improperly done job?

A. Primarily it was her bossiness and her - - some personal habits she had that were very - - that were offensive.

Q. And what were those?

A. Smacking her gums and - - she would chew gum a lot, and I had to tell her, on several occasions, not to do that, because she would be popping them, and it would be fine for awhile, then she would start again.

Q. Besides chewing gum, any other personal habits you had a complaint about?

A. It's not chewing the gum that was offensive.  It's the popping and the smacking that was intrusive as to the co-employees.

. . .

Q. Anything else about personal habits?

A. Her bossiness.

Q. Any other specifics as to complaints from other employees?

A. Her nosiness.

Q. Any specifics on that?

A. There was a fight over opening my mail, and she always to grab it and open the mail.  I mean, I could not believe it.

Q. Was that not part of her job?

A. No.

Q. To open your mail?

A. No, that's assigned to another legal secretary.

Q. Okay. Who was supposed to do that?

A. It was Joan Murphy, I think at that time.

Q. And was there a dispute between Ms. Murphy and Ms. Allen as to who was to be opening mail?

A. Ms. Allen created the dispute.

Q. Was there a dispute?

A. Ms. Allen created the dispute.  That's it.  I mean, there - - since she created a dispute, yes.  She wanted to open - - she wanted to get the mail and open the mail.

. . .

Q. Any other employees besides Ms. Murphy that came to you?

A. Yes.

A. Brenda Kitelinger.

Q. And what was Ms. Kitelinger's complaint?

A. She was being bossy, she was being nosy.

. . .

Q. What was her complaint?

A. I can't recall the specifics.  It was on frequent occasions that Brenda was offended by Ms. Allen's superiority attitude or that Brenda was incompetent.

Q. What was Brenda's position?

A. Legal assistant - legal secretary.

Q. Was she assigned to a certain attorney.

A. Yeah, me.

Q. Okay. How many legal secretaries did you have assigned to you while - - during the time that Ms. Allen was working?

A. Three.

Q. And Joan was the other one? Any other employees you remember specific complaints from or about?

A. I had some lawyers that made complaints.

. . .

Q. Okay. And do you remember their names?

A. Michael Henthorn, Marshall Vittle, Mark McAdams, and Jim McDowell.

Q. Do you remember any of their complaints specifically?

A. She would try to be a lawyer, try to direct them what to do.

Q. And did they all have similar complaints?

A. Basically.

Q. How about your interaction with Ms. Allen? Did you find her bossy and nosy as well?

A. Yes.

Q. Can you give me any specifics as to...

A. I remember one incident when she basically chastised me for not taking telephone depositions.  She was telling me how much better telephone depositions were.  And I - - I looked at her and I said, "I'm the lawyer."

Q. Any other specifics that you can remember?

A. I talked to her so many times, and it was like talking to a wall.

Q. Okay. Any other specifics situations besides the one you just told me?

A. I'm drawing a blank at this point.

. . .

Q. Besides those two methods, any other method you used to address the difficulties you were running into with Ms. Allen?

A. Personal conferences with her and the appraisal. The conferences were by telephone and in person.

Q. And did you ever have a witness present for the conversations or did you just do them one-on-one?

A. There might have been on occasion discussions with Ms. Allen, and I

-6-

think there were, especially with the chewing gum situation.  It got to the point I had to ask her in front of Brenda and Joan not to chew gum because she continued to interfere with them.  And I think the situation about the mail was an issue, I just stood there and verbally said, "This is what we're going to do."

Q. Okay.

A. And I think there was also a situation where Barbara was - - before she - - several times that she took it upon herself to dictate her own schedule, and I had to stand in front of everybody in - - in the room and say, "This is what, you know, if you don't want to come to work or there's some reason, I need to know.  You need to have prior excuse or approval."

Q. And about dictating her own schedule, did you say earlier that that was the straw that broke the camel's back?

A. Yeah.

Q. As far as the decision to terminate?

A. She didn't show up when she was supposed to.

Q. Okay. The first thing I want to ask you is what - - what do you mean by dictating her own schedule.  Can you explain that to me?

A. She was supposed to be here at 8:30.

Q. And how was she dictating her own schedule?

A. She would not come to work when she's supposed to be here.

Q. Did you ever give her permission to come late to work?

A. I may have.

Q. Do you believe there were times you didn't give her permission where she also came late?

A. No.  I mean, yeah, the one time I fired her.

. . .

Q. Which is the one that made you decide to terminate her?

A. When she failed to show up that one morning and left me a message that she's going to be late because she has to take her daughter - - or her dog for a shampoo.

Q. Her dog?

A. Yeah.

Q. Had you and she had any understanding concerning taking care of her dog before?

A. Understanding?

Q. Right. Had you ever given her permission to come in late or to time to care for her dog before?

A. I don't recall that.

Q. How long was it after that day that you notified Ms. Allen that you were going to terminate her?

A. When she came to work that day I told her.  I believe. It might have been the next day, but...

Q. And method-wise, how did you tell her she was going to be terminated?

A. I brought her into my office.

Q. Verbally?

A. Yes.

Q. To the best of your memory, can you remember what you said and what she said during the conversation?

A. I brought her into my office - - previously - - let me backtrack a little bit. She had - - when I had done the evaluation of her, I brought her in my office and I discussed with her her problems, people skills problems primarily. And at that point in time, it was a situation that I had discussed with her on numerous occasions and I told her, you know, this needed to be substantial improvement needed to be done, and surprisingly enough, a couple of weeks after that, she came into my office and asked me for a raise. And during that point in time, I said, "Barbara, we already discussed you were primarily on probation. You haven't done what you're supposed to be doing in this work - - in this office." And we continued to talk a little bit on and off. And another time, before her termination, she came back into my office and - - and this one time, what I primarily remember, she was standing right in my face and telling me something, and I can't remember what it was and I asked her to back off, and I said, "Barbara, I am trying really hard to make yo fit into this office and you're just not working with me."

A. And so, when she didn't show up that morning, I don't know if it was the same day or the next day, I brought her in my office and I said - - I just told her, I said, "This is jut not working. We have bent over backwards trying to find you a place here and trying to work with you, an it's just - - you're not changing. You keep doing the same things and causing confrontation with staff, with outside people." She knew of the issue about everybody being to work when they're supposed to, but she took it upon herself just not to show up, and - - and it was - - I just got to the point, I said, "I can't - - we can't continue like this." It was - - I hate terminating people.

Q. I understand that.

A. And there - - I told her, you know, "Take 30 days and look for a job." And then she asked me, "What am I supposed to say to people," or something like that. I said, "Well, just tell them you and I had a personality conflict." I, you know, it didn't make a difference to me. I said, "Make me out a Devil. I don't care." And I said, " And if you have an opportunity to have an interview anywhere or whenever, just let me know and we'll work around it." And during the 30-days, I don't think she was gone one time for an interview. I don't think she even tried.

A. But it was - - it was a very difficult situation, and I was sorry the way it was, but she just could not - - her - - her people skills did not work in this office.

Q. Did you ever have any complaints about the actual product of her work

-8-

versus her personality and skill - - people skills?
A. Well, I don't know how you can separate when a lawyer comes to me and
- - and says, "Well, she told me to do this and this and this." I don't know
how you can separate that.  I mean, that's part of the job.

Pursuant to defendant's policy, Golding completed an six-month evaluation of plaintiff in December 2001.  The review form contains a rating scale from 1 to 4 with "4" representing "superior,"  "1" representing "needs improvement, and "2" representing "average."  Of the thirty categories evaluated, Golding gave plaintiff a "2" for twenty-two of the categories and a "1" on eight categories.  The eight categories rated a "1" include following instructions, interaction with attorneys and staff, solving problems, crisis management, judgment, attitude and adaptability.   In the "comments" section, Golding wrote "occasionally confrontational", "needs to learn to go with the flow better", "you take pride in your work quality".   In describing areas of needed improvement, Golding wrote, "on occasion, communications, primarily with lawyers, appears confrontational and there is a tendency to have a come back remark when not necessary.  Also needs to go with flow more".

By affidavit, Golding states that plaintiff exhibited a confrontational and dictorial attitude within the first several months of her employment.  She states that she scheduled the follow-up evaluation in April 2002 because of the continuing problems with this behavior.  She states that plaintiff continued to be confrontational during January through March of 2002.  She further states that she advised plaintiff on several occasions to get advanced approval before taking time off of work and on March 15, 2002, she did not get advanced approval but just left a note that she would be in late because she was taking her dog to be shampooed.  According to Golding, this was "the last straw" and as a result, plaintiff's employment was terminated.

Plaintiff testified at deposition in pertinent part as follows:

A. . . The first couple of weeks I was here, we had some deadlines to meet, and she was working on - - on a brief, and so was Michael. And the two of them would work. And there would be all of these changes. And she asked me to come in on a Saturday. And she knew I had a dog. And she said to me, I have - - have dogs. And I bring them in with me. If you feel you want to bring your dog with you instead of leaving her at home, by all means, do so.
. . .
Q. Did you have an opportunity to have a six-month, or thereabouts, review with Ms. Goldilng?
A. Yes
. . .
A. Yes, but I signed it. And even as it says, I acknowledge that this was discussed, my signing this form doesn't necessarily mean that I agree with it, and I didn't agree with it. I had verbally said that to Ms. Golding.
. . .
Q. Now, if we could go back to the first page, did you have an opportunity to generally review this document at the time that it was presented to you?
A. Briefly, before Ms. Golding started to talk. But I did review the whole thing. I mean, I, you know, took my time to do it while I was there in her office, to give my input.
. . .
Did you understand that Ms. Golding assessed your performance as needing improvement in those areas that I just read with regard to the comments that she listed in Item 2, on Page 3?
A. Well, I understand that's how she assessed it, but I didn't agree with that, because no specifics were given to me.
. . .
Q. Well, who else had input this evaluation?
A. Okay. Michael  Henthorne talked to Henri about it and went over it with her, because he told me. And he tried to get Henri to change my evaluation, because he disagreed with her on most of the things.

      And he said, I'm sorry, but I couldn't get her to change it.
. . .
A. Well, I just wanted to add, as I told you before, I asked for specifics. I was not given that.

       So I totally disagreed with the comments that she made- - all of them, especially the confrontational.

      And, you know, everybody needs improvement in their work. And I, as a new person, when she says solving problems, crisis management, "needs to learn to go with the flow better," I didn't understand that either, because I tried and did the best that I could under the circumstances.

-10-

This wasn't an easy job and, like I said, working under stress in getting the briefs out.

Bud I did tell her that I disagree entirely with the evaluation. And even though I signed it in the wrong spot didn't mean that, you know, I - -

And when I- - If I was confrontational or I needed improvement in specific areas, I wanted to know where that was. And she would not answer me.

. . .

Q. After you received the exhibit that has been marked as Exhibit No. 9, did you have an occasion thereafter to have any discussions with Ms. Golding concerning your continued employment at the McNair Law Firm?

A. No, sir, there was none.

. . .

After you received the performance evaluation form that we have marked as Exhibit No. 9, at some point thereafter did Ms. Golding ever come to you and tell you that you would no longer have a job here at the McNair Law Firm?

A. Well, of course. In March, when she told me to go look for another job. March 15th.

Q. Can you tell me what you recall of that conversation on or about March 15th of 2002?

A. Yes, sir.

Q. Okay.

A. Okay. She came in the office, and there wasn't anybody here. And I used to be the first one in. I had changed my time because she said she loved my coming in at 8 instead of 8:30. Okay?

So she called me in, and didn't give me any warning prior to this. And I sat down. And the first thing out of her mouth was, Barbara, I think you need to look for another job.

And I just couldn't believe my ears.

And she said, It has nothing to do with your work. She said, It's just a personality conflict that I myself have with you.

And I tried to gather myself together. I was fighting back the tears. And I said - - I was trying to–

I said, How is this happening? What do you mean you have a personality conflict with me? We don't communicate on a face-to-face basis. All communication is mechanical. It's through e-mail or notes. I have never, ever talked back to you or screamed at you or swore at you.

And she's just sitting there and no- - She just says, It's just personality conflict I have with you. It's just me.

And I said, Can you be more specific? Was there an occasion that maybe I don't - - that I might have said something and you took it wrongly.

And I tried to push and pursue it, and she would not answer me.

And I - - I just- - She said, I'll give you 30 days to find another job.

And I said, I just can't believe this is happening. I says, I have never had this happen to me in my entire life of working. No one has ever asked me to leave a job with a personality conflict. I mean, I just- -

And I was just so upset. And I just left her office and went about my work.

. . .

Q. During the period of time of that notice period, was there any mention or discussion of your age with Ms. Golding?

A. No, sir.

Q. During the period of time that you met with her on that morning on or about March 15, in that discussion was there any mention of your age in that meeting?

A. No, sir.

Q. During the period of time from the date of your hire through the period of time of your evaluation in December of 2001, was there any mention of your age?

A. No, sir.

Q. During the period of time from your evaluation up to the point in time when you and Ms. Golding met in March was there any discussion or mention of your age?

A. No, sir, not to me personally.

Q. Was there any mention that you were aware of about your age?

A. You mean to other people?

Q. Was there anything that you're aware of with regard to your age?

A. No.

. . .

THE WITNESS: I just wanted to add to that particular section that this was the first and only time I was ever called into Ms. Golding's office and told that there was a problem with a conflict, a personality conflict.

She had never called me in her office to discuss anything that was wrong with my - - whatever. And I just wanted that to go on the record.

Q. But you did have a meeting with her in December - -

A. December, to do the – But she never mentioned that. That was not brought up, sir.

Q. But you understood that she had some concerns with your performance.

A. Yes.

Q. – as a result of that December performance review?

A. Yes, sir. But that, even was the first time I knew about that, too. I was never –

Like, in other words, in my probation period time, I was never called into her office and given either an oral or a written notice saying, you know, Look, Barbara, you better shape up. You're doing this, this, and this.

That's why I was like dumbfounded when she called me in on the loss

-12-

of my job.

Q.  You say you weren't called into her office.  Did she have any discussions at all with you, not in her office, but perhaps at your desk or –

A.  No, sir.  No, sir.

. . .

Q.  In the complaint, you allege that you believe that you were discriminated against because of your age over 40.  What facts do you rely on to allege that McNair discriminated against you on the basis of your age?

A.  Well, because I was replaced by a younger worker . . .

Q.  And is that what you base your belief that you were discriminated against based on your age –

A.  Yes, sir, because she was 12 years younger than I was.

. . .

Q.  You've indicated to me that you believe that your termination was based upon your age because of the hiring of Ms. Koerner.

A.  Yes, sir.

Q.  Is there any other information or facts that you have to support your belief that you believe that the McNair Law Firm is biased against older employees other than the fact that Ms. Koerner was hired after you left?

A.  Well, an employee was fired before me, in November, and she was 62.

Q.  And who was that?

A.  Inez Richardson.

Q.  As a result of your employment at the McNair Law Firm did you have any information as to the reason why Ms. Richardson was let go?

A.  Well, she had told us.  I mean, she pretty much told everybody in the office that the reason was that she apparently was absent without approval, took a day off without Mr. McDowell's approval.  That's all I was told.

. . .

Q.  Do you have any information to contest the accuracy of the statement that you heard from others with regard to the reason why Ms. Richardson was no longer an employee of the McNair Law Firm?

A.  No, because I  – you know, I wouldn't know if it was right or wrong.

. . .

Q.  During your tenure at McNair did Ms. Golding ever raise her voice or, quote-unquote, scream at you?

A.  No.  She – she would be agitated sometimes if I interrupted her; but, no, she'd never scream at me.

  In fact, one day she came out in the middle of the office – I'll never forget this.  And I had been working on the big case for NBSC downstairs.  And it was, I mean, a big case.  And it was document after document and change after change, and interacting with the banking officials down there, I was.

  And one day I was, you know, at my desk, typing away.  And she came out, and just blurted it out to everybody: Barbara, you did such a good job on this

file.  Why don't you go home early, an hour early.

  Well, I was dumbfounded, because that was the – Henri never gave kudos and compliments, never patted you on the back, which is fine.  You know, I get paid for what I do.

. . .

Q.  As a result of your tenure at McNair, do you have any firsthand knowledge that the McNair Law Firm considered your age as a factor in making its business decisions with regard to your employment?

A.  I wouldn't know that, sir, no.

Q.  Is it your belief that the McNair Law Firm discriminated against you based on some facts, or is it more just a gut feeling that you have?

A.  Well, I mean, I don't have facts.  No one came out and said to me, Well, because you're old, we're going to dump you.

  If you are smart enough to figure things out, number one, as you get older, you become a liability to your employer insofar as health costs go up, disability goes up, you know, anything in the benefit area.  Your salary goes up; you're being paid more.

  And I've known – Or I've read about people that, you know, this has happened to.  And a lot of times they, believe it or not, the employers – I just watched something recently on television where an employer actually told a girl she was being fired because she was using the healthcare plan too much.  And this woman was there for 14 years.

  Now, that – telling somebody that is really – I mean, I couldn't believe it.  They actually showed it.  It was one of the Dateline things.

  My main feeling is this.  Without any warning – I worked hard and enjoyed what I was doing.  I've been a legal secretary for a long time, and I love the law.  And I was learning a new law, which was good for me.  I mean I'll work until the day I die.  I'm a worker.  And since I'm from up north, I'm even a better worker, as they say.

  And Joan Murphy, who I've given you the name before, just many times has said to me, Barbara, I don't know how you did it.  You just sat down and just started to do stuff.

  And I said, Well, you know, it's not that difficult, but I said, you know, I'm just doing what I'm being paid to do.

  And she said, Yeah, but you work so good and you're so good at it, and you're fast and, you know, you can multitask, and you can do all these things.

  And I says, well, I've been doing that for longer than you have.  And I said, you know, it's just a matter of getting used to someone else's procedures.  But that itself –

  And so when I knew I was doing a good job, it really hurt me to think that someone wants to get rid of a good worker, an never – never telling that person that there was a problem.  So what else could I think?

  And then when I find out someone younger than me was hired, well, that

-14-

was it.

I mean there were a lot of circumstances here that I considered. I'm not – I'm not dumb. I'm not that educated, but I'm not that dumb. I don't have a college degree and I don't have a Master's. But common sense, in this day and age, and I do read the business section, the money section, every day and on Sunday. And I learn a lot from that. And I read Money magazine. And I see what employers are doing to people.

. . .

And then to be called in one day and say it's over and not really give me a reason, I was suspect. Not right away, I was too numb.

. . .

So common sense, plus a few other circumstances that happened just right before, led me to believe that. And then Inez being gone in November and me in April – or March – that's kind of close together, of two people that were 62. So I just – That's my reasons.

. . .

Q. And the firm knew that you were 61 years old at the time that they hired you?

A. Okay, but they hired me before they knew, because I didn't fill anything out until orientation. They didn't know what my age was.

Q. But you were still hired by the McNair Law Firm?

A. Yes, sir, but they didn't know how old I was. And I don't look my age.

. . .

Q. And Ms. Golding gave you a performance evaluation in December of 2001; is that correct?

A. Yes.

Q. And she personally had some concerns about your performance in December 2001, even if you disagreed with her concerns. Is that correct?

A. Yes.

Mrs. Allen testified that she believed that she and Golding got along well. She testified that she observed Golding to be abrupt and demanding, but found that to be true of several litigation attorneys she encountered during her career. She testified that she and Golding discussed her coming in thirty minutes late on mornings she was having her dog shampooed because the groomer did not open until 8:00 a.m. Plaintiff submitted her affidavit stating that she was to leave a note for Golding to remind her the day before that she would be thirty minutes late when she was taking her dog to the groomer.

-15-

By affidavit, plaintiff states that she had a cordial and pleasant working relationship with Mr. McAdams, and that both he and Mr. Henthorn praised her work.

Allen, by affidavit, also states that after she received the evaluation form from Golding, she asked Golding for some guidance as to how she could improve, but that Golding offered no guidance. Allen also states that other than the six-month evaluation form and the day she was notified of the termination of her employment, she did not receive any further counseling or notification from Golding or anyone else about her performance.

Allen states that on March 15, 2002, Golding gave plaintiff thirty-days notice of termination of her employment. She states that Golding told her that they had a personality conflict and she was just not working out.

During the thirty-day notice period, Golding was informed that Carol Koenig, with whom Golding had previously worked, had moved back to the Myrtle Beach area and was looking for employment. Koenig submitted an application for employment and Golding hired her to replace plaintiff. Koenig was forty-nine years old. Plaintiff worked her thirty days and an additional week and was then replaced by Koenig.

Mark McAdams testified at deposition that he complained to Golding that plaintiff was abrasive and that he did not appreciate the way she interacted with attorneys, including himself.

Nancy Jeffers testified at deposition that she was an attorney with McNair. She used plaintiff on one occasion to type a 20-page document. Plaintiff told Ms. Jeffers previously to let her know if she needed any help. Ms. Jeffers did not encounter any problems with plaintiff.

-16-

Plaintiff submits weekly time records relating to plaintiff for the weeks beginning November 26, 2001 through April 19, 2002. The records indicate several entries for missed time due to doctors appointments and several entries where plaintiff reported in late for work. They include: November 30, 2001, arrived at 8:30 a.m.; February 6, 2002, arrived at 8:15 a.m.; February 12, 2002, arrived at 8:30 a.m.; March 15, 2002, arrived at 8:15 a.m.; and April 18, 2002, arrived at 9:00 a.m.

### Analysis

The ADEA provides as follows:

It shall be unlawful for an employer –

(1) to fail to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. §623(a).

In order to make out a prima facie case under the ADEA, plaintiff must demonstrate (1) that she was a member of a protected age group; (2) that she was subject to adverse employment action; (3) that her job performance met the employer's reasonable expectations; and (4) that she was replaced by a younger individual. Halperin v. Abacus Tech. Corp., 128 F.3d 191, 201 (4th Cir. 1997); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1314 (4th Cir. 1993). The fourth element can be satisfied by showing circumstances giving rise to a reasonable inference of unlawful discrimination. Halperin, 128 F.3d at 201.

Once plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Once the defendant has

met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination. Reeves, 530 U.S. at 143. During all of the burden shifting scheme set forth in McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Plaintiff is within the protected class, suffered an adverse employment action, and was replaced by a younger individual. The dispute is whether or not plaintiff was performing at a level that met her employer's reasonable expectations. Plaintiff contends that in the light most favorable to the plaintiff, Golding's reason for firing her – she came in late with out getting permission or prior notice – is not true. There may be an issue of fact regarding the understanding between plaintiff and Golding as to the procedure and advance notice required when plaintiff was having her dog shampooed. There may be an issue of fact as to whether or not Golding had "many, many" conversations with plaintiff about the problems with plaintiff's job performance as stated by Golding. Therefore, if you view the facts in a vacuum as plaintiff suggests and consider only March 15, 2002, and the number of times plaintiff's job performance was discussed, an issue of fact as to whether or not plaintiff's performance met defendant's reasonable expectations may exist. However, it is undisputed that others complained to Golding about plaintiff's demeanor, including individuals within the law firm and outside of it. It is also undisputed that Golding gave plaintiff poor ratings on her six-month evaluation and continued her evaluation period to continue to observe her

-18-

performance.

Even assuming, *arguendo*, that plaintiff can establish a *prima facie* case, she has the burden of showing that the reason for the adverse employment action was discrimination *vel non*. The undisputed facts are that plaintiff was hired under a probationary status; that her employment evaluation contained many "needs improvement" ratings, as well as comments regarding her attitude; that she was not given regular employment status but instead her probationary status was continued until April 1, 2002; and that complaints were made about plaintiff being "bossy," "nosey," from people within the law firm as well as outside of it. There may be an issue of fact regarding whether or not plaintiff complied with Golding's instructions regarding advance notice of coming in late and the number of times Golding spoke with plaintiff about performance problems. However, under the facts of this case, no reasonable juror could believe that defendant's decision to terminate plaintiff's employment was based on plaintiff's age. Golding hired plaintiff approximately six months prior to this termination. The law recognizes a presumption against a finding of discriminatory animus when the person who hired the person within the protected class is also the one who made the adverse employment action decision. Proud v. Stone, 945 F. 2d 796, 798 (4th Cir. 19991). This principle seems especially applicable here where the time between hiring and firing is minimal. Plaintiff obviously disagrees with the reasons set forth by the defendant. It is not disputed that Golding gave plaintiff poor ratings at the evaluation in December 2001, and that plaintiff's attitude was one of the matters addressed at that time. It is not disputed that complaints were made to Golding by others regarding plaintiff's demeanor. It is not disputed that plaintiff came in late on March 15, after leaving a note with Golding to that affect. Precisely what the prior agreement was between plaintiff and Golding is not dispositive. It is not necessary to decide "whether the reason

was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[1] Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer").  It is the perception of the employer that is critical. Hawkins, 203 F.3d at 280.  Even a reasoned decision based on incorrect facts is not evidence of pretext.  Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir. 1987), cert. denied, 484 U.S. 977 (1987).  Additionally, proof of the falsity of one reason asserted is insufficient to defeat a motion for summary judgment.  See Machinchick v. PB Power, Inc., 398 F.3d 345 (5th Cir. 2005)( employee must put forward evidence rebutting each one of employer's nondiscriminatory explanations for employment decision at issue); Olsen v. Marshall & Ilsley Corporation, 267 F.3d 597,601 (7th Cir. 2001)(plaintiff must show each of defendant's reasons is pretextual to withstand summary judgment); see also Chapman v. A.I. Transport, et al., 229 F.3d 1012, 1037 (11th Cir. 2000)(stating in dicta that plaintiff must produce sufficient evidence to refute each of the employer's proffered

---

[1] "Proof that the employer's proffered reasons is unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason . . . is correct." Reeves, 530 U.S. at 146-47.  "It is not enough to disbelieve the [employer]."  Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race discrimination."  Id.

reasons). In Olsen, the Seventh Circuit did note an exception to this rule that they have recognized. "'There may be cases in which the multiple grounds offered by the defendant for the adverse action . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment' by pointing out the pretextual nature of one reason." Id. (citing and quoting Wolf v. Buss (America), Inc., 77 F.3d 914, 920 (7th Cir. 1996); Cf Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978)("When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration.")..

Plaintiff argues that creating an issue of fact as to the truth of defendant's legitimate, nondiscriminatory reason proffered combined with a *prima facie* case creates an inference of discriminatory motive sufficient to defeat a motion under Rule 56. This can be true. See Reeves, 530 U.S. at 147. However, plaintiff must present facts upon which a reasonable juror could find that the termination of employment was based on discriminatory animus. Id. at 148. We should consider the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and the record as a whole. Id. at 148, 151.

This case may present circumstances unfair to plaintiff. However, it is another matter to find that plaintiff would not have been terminated but for age discrimination. Assuming, *arguendo*, a *prima facie* case, plaintiff presents her replacement who was approximately 50 years of age and within the protected class. Merely because she was replaced with a younger individual is not dispositive. Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994)(citing Chappell v. GTE Prod. Corp, 803 F.2d 261, 267 (6thCir. 1986). Plaintiff was hired and fired by the same person

-21-

within a nine month period.  Plaintiff presents hearsay evidence that another employee, who was 62 years of age, who's employment was terminated several months prior to the termination of plaintiff's employment.  However, regardless of whether it is appropriate to consider this evidence under Rule 56 as presented, the evidence has no relevance.  It is undisputed that she was fired for legitimate reasons.  Thus, plaintiff presents, *arguendo*, a *prima facie* case and a question of fact as to part of defendant's reasons for terminating her employment.  While a reasonable juror could conclude that the decision to fire plaintiff was unfair, or even partially incorrect, (i.e., procedure for late arrival at work), a reasonable juror could not conclude that the decision was based on plaintiff's age.

For the foregoing reasons, it is recommended that defendant's motion for summary judgement be granted.  In the event the district judge agrees with this recommendation, it is further recommended that all other outstanding motions be deemed moot.

August 9, 2005                                     s/Thomas E. Rogers, III
Florence, South Carolina                    Thomas E. Rogers, III
                                                           United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page(s).**

-22-

## Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"
### &
### The **Serious** Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503
